UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CHAD E. MURPHY,

                    Plaintiff,

v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

                    Defendant.

CASE NO. C12-5950 BHS

ORDER ADOPTING REPORT
AND RECOMMENDATION

This matter comes before the Court on the Report and Recommendation ("R&R")

of the Honorable J. Richard Creatura, United States Magistrate Judge (Dkt. 19), and

Plaintiff Chad E. Murphy's ("Murphy") objections to the R&R (Dkt. 20).

## I.    BACKGROUND

The ALJ found at step one of the sequential analysis that Murphy had not engaged

in substantial gainful activity since April 10, 2009, the application date. Dkt. 10-2 at 16

(Tr. 15). At step two, the Administrative Law Judge ("ALJ") determined he had bilateral

carpal tunnel syndrome, status post bilateral release; degenerative disc disease of the

lumbar and cervical spine; chronic obstructive pulmonary disease; pancreatitis;

depression; anxiety; marijuana abuse; and alcohol and opiate dependence, in reported

remission. *Id*. at 16-17 (Tr. 15–16). At step three, the ALJ found Murphy's impairments,

1 considered individually and in combination, did not meet or medically equal one of the

2 impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1 (the Listings). *Id*. at 17-

3 18 (Tr. 16–18).

4       Before continuing to steps four and five, the ALJ found that Murphy had the

5 residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds

6 frequently and sit, stand, and walk six hours each in an eight-hour workday. *Id*. at 19 (Tr.

7 18). The ALJ further found that he could not climb ladders, ropes, or scaffolds; could

8 handle and finger occasionally; and could perform tasks learned in 30 days or less

9 involving simple, work-related decisions, few workplace changes, and occasional and

10 superficial interaction with the public. *Id*. at 19-24 (Tr. 18–23).  At step four, the ALJ

11 found that, given Murphy's Residual Functional Capacity ("RFC"), he could not perform

12 his past relevant work. *Id*. at 24 (Tr. 23). Finally, at step five, the ALJ determined that,

13 considering his RFC, age, education, and work experience, as well as the testimony of the

14 vocational expert, Murphy was able to perform work existing in significant numbers in

15 the national economy.  *Id*. at 24-25 (Tr. 23–24). Accordingly, the ALJ found that he was

16 not disabled. *Id*. at 25-26 (Tr. 24–25).

17       On November 8, 2012, Murphy filed a complaint in federal court appealing the

18 ALJ's decision.  Dkt. 4. On February 3, 2014, Judge Creatura issued an R&R

19 recommending the Court find Murphy not disabled.  Dkt. 19.  On February 18, 2014,

20 Murphy filed objections to the R&R.  Dkt. 20.  On March 4, 2014, the Commissioner

21 filed a response to Murphy's objections. Dkt. 21.

22

1   Judge Creatura found that Murphy failed to establish harmful error in the ALJ's

2   evaluation of the medical evidence and did not demonstrate that either the ALJ's

3   assessment of Murphy's RFC or step five findings are deficient.  *See* Dkt. 19.

4   Murphy argues that the Court should decline to adopt Judge Creatura's R&R. Dkt.

5   20. He objects to Judge Creatura's decision because (1) the ALJ erred by improperly

6   rejecting every examining physician, while relying on the opinions of two non-examining

7   physicians; (2) this error tainted the ALJ's evaluation of Murphy's testimony; and (3) the

8   error in evaluating the medical evidence tainted the ALJ's residual functional capacity

9   assessment, resulting in the ALJ making a legally erroneous decision and one not

10   supported by substantial evidence.  Dkt. 20.

11   The Commissioner argues that the Court should adopt Judge Creatura's R&R

12   finding Murphy not disabled.  Dkt. 21. She maintains that the R&R is correct in its

13   analysis and conclusion and incorporates by reference her brief on the merits. *See* Dkt. 21

14   at 2 (*citing* Dkt. 17).

15   **II.      DISCUSSION**

16   **A.      Standard of Review**

17   The district judge must determine de novo any part of the magistrate judge's

18   disposition that has been properly objected to.  The district judge may accept, reject, or

19   modify the recommended disposition; receive further evidence; or return the matter to the

20   magistrate judge with instructions.  Fed. R. Civ. P. 72(b)(3).

21

22

**B.    Application of the Standard**

Murphy takes issue with Judge Creatura's evaluation of the ALJ's assessment of the medical evidence regarding the limitations of attention deficit hyperactivity disorder and other mental health issues, carpal tunnel syndrome, degenerative disk disease, as well has how the ALJ's allegedly erroneous assessment of that medical evidence impacted the ALJ's credibility and RFC determinations, as well as the step four and five analysis. *See* Dkt. 20. The Court, therefore, considers each issue in turn.

**1.    ADHD and Mental Limitations**

The ALJ concluded that the record does not contain evidence of any diagnosis or treatment for ADHD and that the evidence of all examining physicians on issues related to his mental limitations should be rejected or given little weight. *See* Dkt. 10-2 at 14-26 (Tr. 13-25). In part, he reasoned:

A number of Washington State Department of Social and Health Services [("DSHS")] psychological/psychiatric evaluations have further been submitted as evidence. Donna Smith, Ph.D. completed evaluations on November 3, 2003 and again on January 25, 2006, determining the claimant's depressed mood and social withdrawal were markedly limiting, as was his ability to learn new tasks, complete complex tasks and tolerate the pressures of work. She cited the claimant's presentation but noted the claimant was capable of completing serial 3s and 7s with some errors. A more detailed evaluation was performed as supporting evidence, concluding the claimant's intelligence was average with superior abilities in perceptual organization. However, she stated he had "severe" attention deficit hyperactivity disorder that left him "unprepared" for work. Once his depression symptoms were treated with medication, he could learn job skills. Exhibit 22F/1 -20. Some weight is assigned to this assessment. Although the claimant's intelligence level is consistent with the record, the marked limits are not consistent with the record, the objective testing, showing few errors and the state evaluations. On this basis, the undersigned assigns little weight to the limits. Further, the record does not contain

1    evidence of any diagnosis or treatment for attention deficit hyperactivity
     disorder; thus, this diagnosis is not weighed heavily.

2
     Dkt. 10-2 (Tr. 21).

3
          Keith Krueger, Ph.D. submitted his evaluation on January 2, 2007.

4    Dr. Krueger assessed only "none to moderate" limitations in the claimant's
     depressed mood and anxiety. These restrictions only mildly interfered with

5    the claimant's cognitive and social factors, with a moderate limit in his
     ability to respond to the pressures and expectations of work. Exhibit 24F/l -

6    6.
          In January 2008 and again in May 2008, Kevin N. Morris, Ph.D.

7    performed an evaluation, finding mild to moderate symptoms in the
     claimant's depression and anxiety symptoms based on the interview,

8    impressions and observations. The later evaluation found marked
     limitations in the claimant's social factors. Exhibits 1F/1- 13, 27F/1 - 12.

9         Michael Brown, Ph.D. next performed an assessment on September
     17, 2008, finding "none to marked  limitations," with the claimant's

10   depressed mood and anxiety markedly limiting. Moderate limits were found
     in the claimant's cognitive factors based on a mental status examination.

11   His social factors were markedly limited in his ability to relate to the public
     and respond to work pressures based on the claimant's reports of anxiety

12   and problems interacting with coworkers at prior jobs. Exhibit 3F/l- 13.
          In conclusion, little weight is given to these Washington State

13   Department of Social and Health Services evaluations. They are
     inconsistent, with some reporting none to mild limitations while others

14   reported marked limitations. Neither the record nor the state evaluations
     support marked limitations and although the assessors submitted mental

15   status examinations, they seemed to be based mostly on the claimant's
     subjective responses, and are not reliable factors for assigning marked

16   limitations. Without detailed, supporting evidence to account for these
     extreme limits the undersigned presumes the marked limits are from the

17   claimant's subjective complaints while attempting to qualify for benefits.
     Noted, these assessments were completed during the time period that the

18   claimant has admitted to abusing substance/seeking narcotics, discussed
     earlier, which may have influenced the findings. Further, these providers

19   have not regularly treated the claimant, thus a longitudinal picture has not
     been created.

20
     Dkt. 10-2 at 22-23 (Tr. 21-22).

21

22

1    Judge Creatura found that Murphy "failed to make any attempt to show that

2    the alleged failure to accept the 'diagnosis' of ADHD would have affected" his RFC

3    assessment.  Dkt. 19 at 6.  Further, Judge Creatura found that Murphy did not attempt to

4    argue or demonstrate that the alleged failure to consider a "diagnosis" of ADHD was

5    harmful error or prejudiced him in any way.  *Id*.  Judge Creatura also found that Murphy

6    failed to argue that the ALJ should have included ADHD at step two or that the ALJ

7    overlooked specific limitations that any of the DSHS examining psychologists indicated

8    were caused by ADHD when assessing Murphy's RFC.  *Id.*  Therefore, Judge Creatura

9    concluded that Murphy's "vague challenges to the ALJ's evaluation of the medical

10   evidence … fail to connect any alleged errors to any specific step in the ALJ's sequential

11   evaluation process," and thus do not to support his request for reversal.  *Id*. (*citing Molina*

12   *v. Astrue*, 674 F.3d 1104, 1121 (9th Cir. 2012 ) (explaining that errors are harmless if

13   they are "inconsequential to the ultimate nondisability determination") (citation

14   omitted)).

15       Murphy argues that the ALJ did not state a legitimate reason for rejecting

16   Dr. Smith's opinion that he was markedly limited in his ability to respond appropriately

17   to and tolerate the pressures and expectations of a normal work setting.  Dkt. 20 at 2

18   (*citing* Dkt. 16 at 3-13, Plaintiff's Opening Brief). Murphy maintains that "Dr. Smith's

19   opinion was consistent with her findings that Murphy was 'easily distracted,' 'has severe

20   learning disabilities,' and '[t]ook 115 seconds on Trial B which is indicative of brain

21   dysfunction.'" *Id*. (*citing* Tr. 981). Murphy argues that contrary to the ALJ's finding the

22   record does indicate that in 1989 a neurophyschological evaluation by Steven Morton,

1    Ph.D., stated that Murphy, at 13 years, 9 months, "appeared to require an extraordinary

2    amount of effort for a child of his age in order to maintain the focus of his attention. Dkt.

3    20 at 3 (*citing* Dkt. 16 at 13-14). Additionally, Murphy argues that while Judge Creatura

4    stated that Murphy had failed to show that his alleged failure to consider a diagnosis of

5    ADHD resulted in harmful error, the "harmful error was not in rejecting Dr. Smith's

6    opinion about the presence of this diagnosis; his error was in failing to accept Dr. Smith's

7    opinion about Murphy's limitations." Dkt. 20 at 3. He further maintains that the ALJ

8    improperly based his rejection of Dr. Smith's opinion in part on the ALJ's false statement

9    indicating that the record contained no evidence of diagnosis or treatment for ADHD. *Id.*

10    Regarding the opinions of examining Drs. Kreuger, Morris and Brown, Murphy argues

11    that "none of the ALJ's reasons for rejecting all their opinions" were legitimate. Dkt. 20

12    at 4.

13        The record consists of a significant amount of medical opinions from different

14    examining physicians, none of whom have treated Murphy on an ongoing basis to

15    provide a longitudinal picture of his mental health issues and the limitations resulting

16    therefrom. Nonetheless, it is the ALJ's duty, in his role as fact-finder, to considered the

17    entire record, weigh the medical opinions, and determine Murphy's RFC. *See* 20 C.F.R.

18    § 416.945. An "ALJ need not accept the opinion of any physician, including a treating

19    physician, if that opinion is brief, conclusory, and inadequately supported by clinical

20    findings." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009)

21    (internal quotation marks and citation omitted). "The ALJ can meet this burden by setting

22    out a detailed and thorough summary of the facts and conflicting clinical evidence,

1    stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d

2    747, 751 (9th Cir. 1989) (internal quotation marks and citation omitted).

3         The ALJ is responsible for judging the medical evidence. *Carmickle v. Comm'r of*

4    *Soc. Sec. Admin.*, 533 F.3d 1155, 1164 (9th Cir. 2008).  He serves as "the final arbiter"

5    who resolves ambiguities in the medical evidence.  *Tommasetti v. Astrue*, 533 F.3d 1041

6    (9th Cir. 2008). So long as there is more than a scintilla of evidence to support the

7    interpretation of the medical evidence the ALJ provides, his findings should not be

8    overturned, even if the evidence could also support an alternative conclusion. *Valentine v.*

9    *Comm'r of Soc. Sec. Admin.*, 574 F.3d 698, 690 (9th Cir. 2009).

10        The Court finds that the ALJ properly evaluated the medical evidence in the

11   record and concludes that substantial evidence supports the ALJ's conclusions regarding

12   the severity of his mental health limitations.  As to Dr. Morris, he found no "marked"

13   limitations in either Murphy's cognitive or social factors in 2003.  Dkt. 10-7 at 4 (Tr.

14   215).  In 2008, he changed his opinion to reflect moderate cognitive limitations and some

15   marked social limitations, which he stated were expected to last up to six months. Tr.

16   1034 -36. To the extent that Dr. Morris and other examining physicians found less severe

17   limitations (none to moderate) resulting from Murphy's mental health conditions, those

18   limitations were properly captured in the RFC, which allows for simple, work-related

19   decision, tasks that can be learned in 30 days or less, few workplace changes and public

20   interaction on only a superficial and occasional basis.  *See supra.* and Dkt. 10-2 at 19 (Tr.

21   18).

22

1          To the extent that the aforementioned examining physicians provide for marked

2  limitations, the ALJ is correct that those opinions are not all consistent with each other

3  and have no apparent basis in the objective evidence in the record. 20 C.F.R. §

4  416.927(c)(3), (4). For example, despite Dr. Mayers's findings based on objective,

5  mental status examination, which were relatively benign, she opined his prognosis was

6  poor. *See* Dkt. 10-8 at 79-85) (Tr. 348-351).  Similarly, while Dr. Smith indicated a

7  diagnosis of ADHD[1], as Judge Creatura stated, a "diagnosis alone does not necessarily

8  demonstrate the existence of any severe functional limitation." Dkt. 19 at 6.  Further, Dr.

9  Smith identified markedly limitations in Murphy's ability to learn new tasks, complete

10  complex tasks and tolerate the pressures of work, but Murphy's performance on the

11  mental status examinations in both 2003 and 2006 did not support a finding of marked

12  limitations. *See* Dkt.11-2 at 8-27 (Tr. 967-86).  For example, Murphy's IQ was average;

13  he recalled three words immediately after five minutes, performed serial sevens from 100

14  to 2, with only three mistakes. *Id.* In 2006, Dr. Smith's mental status exam revealed

15  similar objective results.

16

17  _____

18          [1] Murphy's medical records from Dr. Smith indicate that she reviewed a 1989 medical
19  evaluation from Dr. Morton, which stated that Murphy at age 13 years and 9 months "appeared
to require an extraordinary amount of effort for child of his age in order to maintain focus and
attention." Dkt.11-1 at 89 (Tr. 935). However, Morton does not diagnose Murphy with ADHD;
20  in fact, he never mentions that medical diagnosis.  As to Dr. Smith, her November 2003
evaluation indicates that Murphy was diagnosed with ADHD by Dr. Morton, as documented in
21  his 1989 report. Dkt. 11-2 (Tr. 967).  It is unclear on this record if Dr. Smith made the ADHD
diagnosis based only on Dr. Morton's medical report or based on her clinical findings on exam
22  or both.

ORDER - 9

1    Additionally, contrary to Murphy's contention, in the absence of objective,

2  consistent medical evidence, the marked limitations found by examining physicians do in

3  fact appear to be based on Muphy's subjective complaints, which were properly found

4  not credible. *Batson v. Comm'r of Soc. Soc. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004)

5  (opinion based on discredited subjective complaints warrants less weight).  For example,

6  the ALJ properly noted Dr. Brown's opinion regarding Murphy's social factors being

7  markedly limited in his ability to relate to the public and respond to work pressures were

8  based on the claimant's reports of anxiety and problems interacting with coworkers at

9  prior jobs.  Dkt. 10-7 at 28 (Tr. 239).  Further, the examining opinions were from the time

10  period where Murphy was regularly exhibiting drug-seeking behavior and abusing

11  prescription narcotics, a fact not contested by Murphy.  During this period, Murphy's

12  conduct demonstrated a lack of candor towards some physicians regarding his drug-

13  seeking behavior and alcohol abuse, attempted early-prescription refills, and violations of

14  his pain medication contract.  His actions, which are reflected in the record and clearly

15  laid out by Defendants in their response brief and in the ALJ's decision, eroded his

16  credibility.  *See, e.g*, Dkts. 10-2 at 20-21 (Tr. 19-20) and 17 at 13-17; *Verduzco v. Apfel*,

17  188 F.3d , 1087, 1090 (9th Cir. 1999) (ALJ may rely on evidence of substance abuse to

18  find claimant less than credible, particularly when evidence suggests that claimant

19  deceived medical providers about his history).

20    Although Murphy may interpret the evidence differently, the Court finds the ALJ

21  properly applied the law and his findings are supported by substantial evidence in the

22

1  record. *See Valentine*, 574 F.3d at 694 (referring to substantial evidence as a "highly

2  deferential" standard of review).

3        **2.**      **Degenerative Disk Disease of the Lumbar and Cervical Spine**

4        Murphy argues that the ALJ failed to acknowledge Murphy's November

5  2008 cervical spine MRI, which constitutes "a significant objective finding of pathology

6  that can reasonably be expected to cause pain and other limitations." Dkt. 20 at 5 (*citing*

7  Tr. 1121; *Flores v. Shalala*, 49 F.3d 562, 571 (9th Cir. 1995), *citing Vincent v. Heckler*,

8  739 F.2d 1393, 1395 (9th Cir. 1984) (*quoting Cotter v. Harris*, 642 F.2d 700, 706 (3d

9  Cir. 1981)). Murphy further argues that contrary to the Judge Creatura's analysis, the fact

10  that an MRI report does not describe specific functional limitations does not justify the

11  ALJ's failure to discuss this evidence, nor does it justify the ALJ's failure to account for

12  symptoms and limitations that are reasonably related to the pathology described in the

13  MRI report.  If the ALJ did not understand the relationship between that pathology and

14  Murphy's symptoms, Murphy argues that the ALJ should have obtained medical expert

15  testimony on this issue.  Dkt. 20 at 5-6.

16        Murphy cites to no case law that actually contradicts Judge Creatura's analysis or

17  supports that where there is no physician's statement assessing limitations or other

18  medical evidence stating that the MRI-identified pathology would reasonably result in the

19  type of pain or limitations to which Murphy testified, the ALJ does not have to provide

20  clear and convincing reasons for rejecting physician's statements in the MRI describing

21  the pathology.

22

1      The Court agrees with Judge Creatura's apt analysis. He states in relevant part:

2      The ALJ is not required to discuss every piece of evidence. The mere fact
       that a physician makes a pathological finding does not mean, necessarily,
3      that plaintiff has a functional limitation.

                                            ***

4      The Court notes that the ALJ acknowledged this imaging evidence at step
       two, in explaining why he found plaintiff's degenerative disk disease of the
5      lumbar and cervical spine to be a severe impairment (Tr. 15). Although
       plaintiff argues that the ALJ should have discussed the "interpretation" of
6      his imaging evidence, as described by Joseph Stengel, D.O., Dr. Stengel did
       not attempt to interpret how the imaging evidence impacted plaintiff. He
7      described it, but he did not address any functional limitations caused by it
       (Tr. 1121). Because Dr. Stengel's report does not contain any opinions
8      regarding plaintiff's physical limitations, the ALJ did not err in failing to
       discuss it while assessing plaintiff's RFC. *See, e.g., Turner v. Comm'r of*
9      *Social Sec. Admin.*, 613 F.3d 1217, 1223 (9th Cir. 2010) (ALJ not required
       to provide clear and convincing reasons to reject physician's statement
10     when statement did not assess any limitations).

11     Dkt. 19 at 8-9.

12         The Court adopts the R&R on this issue.

13     **3.     Carpal Tunnel Syndrome**

14         Murphy objects to Judge Creatura's R&R because it indicates that Murphy failed

15     to adequately explain both the significance of Antoine D. Johnson, M.D.'s findings and

16     the significance of the aforementioned cervical spine MRI, which showed "moderate to

17     severe left neuroforaminal stenosis, impacting the T1 nerve root." Dkt. 20 at 5 (*citing*

18     Dkt. 19 at 7-8).  Murphy maintains that Dr. Johnson's opinion shows that his carpal

19     tunnel syndrome caused significant limitations in the use of his hands, which is consistent

20     with his testimony in which he described the recurrence of these symptoms. Dkt. 20 at 5.

21     He argues that the MRI also supports Murphy's testimony about limitations in his hand

22     dexterity, which overlaps the limitations related to his carpal tunnel syndrome. *Id.*, n. 11.

1    On September 17, 2007, Dr. Johnson assessed Murphy's carpal tunnel syndrome

2  assessing his severity as "very significant interference with the ability to perform one or

3  more basic work-related activities" with regard to "lifting," "handling" and "carrying."

4  Dkt. 11-2 at 71 (Tr. 1030).

5    The ALJ rejected Dr. Johnson's opinion regarding the severity of Murphy's

6  limitations in part because his notes of the evaluation were brief, and they did not

7  reference any objective testing or detailed information that would support such extreme

8  limitations. *See* Dkt. 10-2 at 23 (Tr. 22). Additionally, the ALJ found that in a December

9  16, 2008 independent medical exam completed for the purposes of workers'

10  compensation, the examining physician Kenneth Partlow, M.D., an orthopedic surgeon,

11  found that after Murphy had surgeries on his wrists, the diagnosis of carpal tunnel

12  syndrome remained, but that he had reached maximum medical improvement,

13  recommended "no further diagnostic studies or therapeutic intervention," except that he

14  should be "weaned off his narcotics" and found "no objective worsening of his

15  symptoms." Dkt. 11-4 at 32-35. Additionally, the ALJ also found that the February 13,

16  2009 assessment by neurologist R. Glenn Snodgrass, M.D., another post-surgical

17  examining physician, found "no further treatment" or "surgery" was necessary, as there

18  were "no positive Tinel's signs at the wrist or valid Phalen's signs."  Dkt. 10-2 at 23.

19  Indeed, Dr. Snodgrass also found "no objective evidence of worsening." Dkt. 11-4 at 49

20  (Tr. 1169). In March 2009, Murphy's provider, Dr. Price M. Chinault, M.D., found his

21  wrists showed improvement on physical examination.  Specifically, he found that

22  Murphy had "full satisfactory flexion and extension," "full pronation and supination

1    bilaterally," "well healed" wounds, "no point [of] tenderness," " moderate grip strength

2    bilaterally that is nearly symmetrical," as well as "[c]irculation and sensation … intact."

3    Dkt. 10-7 at 46 (Tr. 257).

4          The Court concludes that the ALJ did not err in failing to accept the limitations

5    assessed by Dr. Johnson, which contained pre-surgical limitation assessments, failed to

6    reference objective testing or make detailed findings, when post-surgical examining

7    doctors' assessments found improvement, no need for further treatment, therapy or

8    surgery.  *See supra.*

9          As noted above, an "ALJ need not accept the opinion of any physician, including a

10   treating physician, if that opinion is brief, conclusory, and inadequately supported by

11   clinical findings." *Bray*, 554 F.3d at 1228 (9th Cir. 2009) (internal quotation marks and

12   citation omitted). "The ALJ can meet this burden by setting out a detailed and thorough

13   summary of the facts and conflicting clinical evidence, stating his interpretation thereof,

14   and making findings." *Magallanes*, 881 F.2d at 751(9th Cir. 1989) (internal quotation

15   marks and citation omitted).  Here, the ALJ met his burden with respect to Dr. Johnson

16   and the medical evidence the ALJ rejected regarding the severity in limitations allegedly

17   resulting from Murphy's carpal tunnel syndrome.

18         The Court adopts Judge Creatura's conclusion with respect to the issue of

19   the ALJ's assessment of carpal tunnel syndrome.

20

21

22

ORDER - 14

### 4.      Murphy's Credibility

Murphy objects to Judge Creatura's recommendation that the ALJ did not err in making his credibility determination. Specifically, Murphy submits that the ALJ's credibility determination, regarding his symptoms and limitations as they relate to any of his impairments, was "tainted by [the ALJ's] failure to properly evaluate all of the medical evidence." Dkt. 20 at 7.

Because the Court finds that the ALJ properly evaluated the medical evidence, it is unnecessary to discuss the ALJ's credibility determination in great detail.  However, to the extent that the ALJ found that the alleged severity of Murphy's conditions and limitations were undermined by his credibility and relied on those determinations to support his conclusions, the Court finds the ALJ correctly assessed his credibility. As discussed above, the ALJ provided clear and convincing reasons why Murphy's substance abuse, his lack of candor to physicians about that topic, his violation of pain contracts and his attempts to seek early refills on prescription medication eroded his credibility.  *See supra.*  Additionally, as Judge Creatura observed,

> the ALJ provided a number of reasons to discount the credibility of plaintiff's subjective testimony, including lack of corroboration in the medical record, evidence of improvement with conservative treatment, evidence of drug-seeking behavior and substance abuse, evidence of self-limitation and lack of motivation to work ….

Dkt. 19 at 12. Each of these reasons is explained with detail by both the ALJ and Judge Creatura, and they are well-documented in the record.  *See* Dkts. 10-2 at 19-21 (Tr. 18-20) and 19 at 12-17.  Thus, while Murphy correctly notes that lack of corroboration in the

medical record cannot alone support an adverse credibility determination (Dkt. 16 at 21), the other multiple, detailed reasons in the record and set forth in the ALJ's decision were not deficient. *See Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) ("While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects.").

The Court adopts Judge Creatura's conclusion on this issue for the reasons set forth above.

**5.     Steps Four and Five**

Because the Court has found that the ALJ properly assessed the medical evidence in the record, evaluated Murphy's credibility and determined substantial evidence supports the ALJ's findings, it follows that the Court finds the ALJ's conclusions at steps four and five proper.

**III.     ORDER**

The Court having considered the R&R, Plaintiff's objections, and the remaining record, does hereby find and order as follows:

(1)     The R&R is **ADOPTED** for the reasons set forth above; and

(2)     This action is **DISMISSED**.

Dated this 12th day of August, 2014.

BENJAMIN H. SETTLE
United States District Judge